# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| v. | : | |
| | : | |
| POWERLINX, INC. (f/k/a SEAVIEW VIDEO TECHNOLOGY, INC.), GEORGE S. BERNARDICH III, and JAMES R. COX, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") alleges for its Complaint against defendants as follows:

## NATURE OF THE ACTION

1.       This action involves a pattern of fraudulent and other improper conduct over a four-year period by Defendant PowerLinx, Inc. ("PowerLinx"), a manufacturer of security products and underwater cameras. During the first three quarters of fiscal year 2000, PowerLinx fraudulently recognized nearly ninety percent of its reported revenues based on fictitious sales. PowerLinx initiated consignment arrangements with numerous third-party dealers and recorded the consignment order amounts as revenue before any cameras were manufactured, shipped to the dealers, or sold to customers. PowerLinx publicly announced its artificially inflated revenues in

frequent press releases and three consecutive quarterly reports filed with the SEC. In April 2001, following a management change, PowerLinx restated its second- and third-quarter revenues as part of its fiscal year 2000 annual report. However, PowerLinx's restatement was incomplete and misleading, and the accompanying annual report contained additional materially misleading disclosures and accounting errors. During this same period, PowerLinx also issued numerous deceptive press releases that materially misrepresented the company's operations and offered glowing, but unsubstantiated, revenue and earnings forecasts.

2.      PowerLinx's conduct in fiscal years 2000 and 2001 violated the antifraud provisions and certain reporting, recordkeeping, and internal control provisions of the federal securities laws. Richard L. McBride ("McBride"), PowerLinx's former chief executive officer, chairman, and controlling shareholder, now deceased, was the principal architect of this fraud. Defendant James R. Cox ("Cox"), PowerLinx's former secretary, treasurer, and a director, was also responsible for certain of PowerLinx's fraud and reporting violations during 2000. Defendant George S. Bernardich III ("Bernardich"), who had replaced McBride as PowerLinx's chief executive officer, also aided and abetted certain periodic reporting violations by drafting, reviewing, and signing PowerLinx's fiscal year 2000 Form 10-K.

3.      In September 2004, PowerLinx again violated the antifraud provisions by issuing materially misleading press releases and filing materially misleading reports with the SEC concerning a purported $23 million sales contract with a defense contractor known as Universal General Corporation ("UGC"). In fact, UGC had no revenues, no assets, and no means to satisfy any portion of its $23 million contractual obligation to PowerLinx. PowerLinx had performed virtually no due diligence prior to issuing the press releases and reports in question to determine whether UGC was legitimate and could meet its contractual obligations. Defendant Bernardich

2

was responsible for PowerLinx's due diligence failures, for negotiating and signing the UGC

contract on PowerLinx's behalf, and for knowingly or recklessly drafting PowerLinx's materially

misleading press releases and SEC filings.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to Sections 21(d)(1), 21(d)(3),

21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1),

78u(d)(3), 78u(e), and 78aa].

5.      Defendants, directly or indirectly, made use of the means and instrumentalities of

interstate commerce, or of the mails, or of the facilities of a national securities exchange in

connection with the transactions, acts, practices, and courses of business alleged herein.

6.      This Court properly has venue over this action because certain of the conduct at

issue occurred in the District of Columbia.

## DEFENDANTS

7.      PowerLinx, formerly SeaView Video Technology, Inc., is a Nevada corporation

with its offices and headquarters in St. Petersburg, Florida.  The company manufactures security

cameras, underwater cameras, and accessories.  PowerLinx's stock is quoted on the Over-the-

Counter Bulletin Board ("OTCBB") under the symbol "PWNX."  During the relevant period,

PowerLinx had fewer than fifteen employees, including management.

8.      Bernardich, age 49, is a resident of St. Petersburg, Florida, and was president and

chief executive officer of PowerLinx from February 2001 until April 2005.  He was chairman of

PowerLinx's board of directors from early 2001 until February 2005 and remained a PowerLinx

director until March 2006.

9.      Cox, age 54, is a resident of St. Petersburg, Florida.  Cox was PowerLinx's secretary, treasurer, and a director from the time the company went public in March 1999 until approximately July 2002.  During the relevant period, Cox was responsible for product development, manufacturing, and corporate communications.  He remains employed by PowerLinx in a product development capacity.

## ADDITIONAL RELEVANT PARTY

10.      McBride, deceased, was SeaView's president, chief executive officer, and chairman of its board of directors from the company's inception until February 20, 2001, when he resigned from those positions.  During the relevant period, McBride owned approximately forty percent of SeaView's outstanding common stock.  McBride died on October 7, 2001.

## FACTUAL ALLEGATIONS

## I.    **Background**

11.      McBride founded SeaView Underwater Research, Inc. in April 1998.  In March 1999, SeaView became a reporting company following its reverse merger with a public shell corporation and was renamed SeaView Video Technology, Inc.  In 2003, the company changed its name to PowerLinx.

12.      PowerLinx's business initially consisted of manufacturing and selling underwater video cameras and accessories.  In 1999 and 2000, the company sold its products directly to consumers, primarily at boat shows.  PowerLinx received payment for its goods at the time of product delivery, and did not extend credit or financing to customers during the relevant period.

13.      In late 1999, PowerLinx began developing a video surveillance product known as "SecureView," which used a "camera in a light bulb" technology to transmit video signals through electrical wiring to a television monitor.

4

II.     **Fraudulent Conduct During Fiscal Year 2000**

A.      **Improper Revenue Recognition**

14.     During the first three quarters of fiscal year 2000, PowerLinx fraudulently recognized nearly ninety percent of its reported revenues based on fictitious sales of its cameras. Most of the cameras in question were neither manufactured nor shipped during the period in which the revenue was recorded.

15.     As part of the scheme, PowerLinx utilized a sales program known as "dealer floor plans," which were, in essence, consignment arrangements whereby dealers agreed to display PowerLinx's camera products without actually purchasing them (*i.e.*, without accepting title and the risks/rewards of ownership).  Beginning in the first quarter of 2000, PowerLinx solicited hundreds of independent marine equipment retailers to participate in the program and accept underwater cameras on consignment.  Under the terms of the dealer floor plans, PowerLinx offered to ship six cameras to each dealer, typically small independent fishing or scuba shops, to be displayed for sale for ninety days in the dealers' stores.  PowerLinx retained title to the cameras, and dealers had no financial obligation to PowerLinx unless they sold cameras within the ninety days.  Following the ninety-day period, dealers could return any unsold cameras to PowerLinx. When a dealer expressed an interest in accepting cameras pursuant to a dealer floor plan, PowerLinx prepared order forms for six underwater cameras, totaling $2,100, and purportedly faxed the forms to the dealer for confirmation.  Then, before any cameras were manufactured, shipped to the dealers, or sold to customers, PowerLinx immediately and improperly recorded the resulting dealer floor plan order amounts as revenue.

16.     Because the dealer floor plans were consignment arrangements, even if PowerLinx had manufactured and shipped the cameras on time, the company could not have recognized

5

revenue on such shipments in accordance with Generally Accepted Accounting Principles ("GAAP") until the cameras were actually sold to customers. Specifically, GAAP provides that revenue recognition is inappropriate on products delivered pursuant to a consignment arrangement, but not yet sold by the consignee (PowerLinx's purported dealers), because the consignor (PowerLinx) retains the risks and rewards of ownership of the product and title does not pass to the consignee.

17.    PowerLinx's dealer floor plan program for underwater cameras continued until September 2000, when the company began soliciting orders for its new SecureView video surveillance product, which still was under development at that time. The SecureView dealer floor plan contained consignment terms substantially similar to those for the underwater cameras, but involved larger volume and dollar amounts: each dealer was to receive twelve SecureView cameras at $300 each, for a total order amount of $3,600. From September through at least December 2000, PowerLinx devoted most of its sales and marketing efforts toward generating dealer floor plan orders for SecureView cameras, and continued its fraudulent practice of recording orders as sales without manufacturing and shipping any cameras, and without selling any cameras to customers. In fact, PowerLinx had only manufactured approximately two dozen prototype SecureViews in all of 2000, and did not produce commercially viable models until May 2001 or later.

18.    PowerLinx publicly announced its fictitious "revenues" in press releases issued on an almost-weekly basis, and included unsubstantiated and materially misleading revenue forecasts. PowerLinx never revealed, in its press releases or otherwise, that its purportedly fast-growing "revenues" were, in fact, nothing more than dealer orders to participate in consignment arrangements.

19.    In addition, PowerLinx reported fictitious accounts receivables and revenues in its quarterly reports on Form 10-Q filed with the SEC for the first three quarters of 2000.

20.    The impact of PowerLinx's improper revenue recognition on its financial reporting was dramatic and material.  For the first three quarters of 2000, PowerLinx overstated its year-to-date revenues by $232,705 (124 percent), $1,220,972 (410 percent), and $2,315,638 (1,546 percent), respectively.  The company also reported net income ranging from $280,000 to $420,000 in those quarters, when it was incurring – and should have been reporting – substantial losses.

21.    McBride was primarily responsible for the company's fraudulent revenue recognition.  McBride controlled and directed the company's sales efforts, devised the dealer floor plan program, instructed and supervised his sales staff on how to soliciting floor plan orders, and knowingly reported those fictitious orders as accounts receivables and revenues to PowerLinx's outside accountant, who prepared the financial statements that were included in the company's periodic filings.

22.    Defendant Cox also was directly responsible for PowerLinx's fictitious revenue reporting.  During the relevant period, Cox supervised the production of PowerLinx's cameras, drafted and disseminated PowerLinx's false and misleading press releases, and knew, or was reckless in not knowing, that the company was reporting sales on cameras that had not been manufactured.  In addition, in his capacities as treasurer and a director, Cox signed each of PowerLinx's Forms 10-Q for the first three quarters of 2000 even though he knew, or was reckless in not knowing, that the financial statements in those reports were materially false and misleading.

**B.    Deceptive Press Releases**

23.    From late 1999 through late 2000, PowerLinx issued numerous press releases that materially misrepresented the company's supply sources, manufacturing capabilities, dealer

7

network, corporate partners, and sales contracts.   For example, PowerLinx issued separate press

releases claiming that: (i) a multinational corporation had agreed to supply parts for SecureView

cameras; (ii) a prominent exchange specialist firm was representing the company in its process of

obtaining listing on the American Stock Exchange, and had expressed confidence that

PowerLinx's application would be successful; (iii) a prominent investment banking firm was

coordinating financing for production of SecureView cameras; (iv) the company had entered into

an agreement to provide at least $80 million worth of SecureView cameras to the Taiwanese

Army; and (v) the company was projecting gross sales of $46 million and net income of $22

million in fiscal year 2000, and gross sales of $168 million and net income of $113 million in fiscal

year 2001.  In each of these instances, PowerLinx's assertions were either completely false or

materially misleading.

24.     McBride was primarily responsible for the content of PowerLinx's false and

misleading press releases.  He broadly disseminated the releases by including them in marketing

materials and by posting them on the company's website and on Internet message boards.

25.     Defendant Cox drafted, edited, and published PowerLinx's press releases during the

relevant period, and his name appeared in each release as PowerLinx's press contact.  Because Cox

was intimately familiar with the development and manufacturing status of PowerLinx's products,

he knew, or was reckless in not knowing, that PowerLinx's press releases contained materially

false information.

### C.     Material Omissions in SEC Filings

26.     During 2000, PowerLinx also knowingly or recklessly failed to disclose in its

annual report that McBride – then its chief executive officer, president, and the chairman of its

board of directors – had been convicted of fraud in February 1998 and was serving a six-year

probation term. PowerLinx was required to disclose such information pursuant to Securities Act of 1933 Regulation S-K.

**D.    Impact of Fraudulent Conduct on PowerLinx's Stock Price**

27.    PowerLinx's improper revenue recognition practices and deceptive press releases dramatically increased the price of PowerLinx's stock during fiscal year 2000. After trading at approximately $1 per share in January 2000, the price of PowerLinx's stock rose to a high of $28.50 per share at the end of February 2000. From March to mid-December 2000, PowerLinx's stock traded in a range from $8 to $17 per share, and averaged nearly $10 per share before collapsing to less than $2 following the publication of a disparaging report about the company in December 2000. Subsequently, PowerLinx's stock price fell to less than $1 per share following the company's announcement in April 2001 that it would restate revenues.

**E.    Materially Misleading Fiscal Year 2000 Form 10-K and Restatement**

28.    In late February 2001, PowerLinx underwent a management change. The company hired a new accounting officer and promoted Bernardich to president and chief executive officer of the company. PowerLinx prepared a restatement of financial results for the second and third quarters as part of its annual report on Form 10-K for fiscal year 2000.

29.    In April 2001, PowerLinx filed its 2000 Form 10-K, which included the restatement. However, even after the restatement, PowerLinx's year-end 2000 accounts receivable balances and revenue amounts balances continued to be materially overstated due to revenues that were improperly recognized from consignment transactions.

30.    As for the second- and third-quarter accounts receivable and revenues that it did restate, PowerLinx failed to disclose that its accounting errors stemmed from having improperly recorded consignment (or dealer floor plan) orders as revenue. Instead, the company claimed that

9

it had "included as revenues and accounts receivable . . . *purchase orders* that were received by the Company for its new SecureView security camera products, *but were not shipped* to the customer by [quarter end]." (Emphasis added). PowerLinx's explanation misled investors because it created the impression that demand for its cameras was so large that the company could not ship products quickly enough to keep pace. In fact, the opposite was true: there was little demand for the SecureView product in 2000. Moreover, the term "purchase orders" was inappropriate because the orders in question were not legitimate customer offers to purchase goods, but rather internally generated consignment orders reflecting nothing more than agreements by dealers to display PowerLinx's cameras on a risk-free consignment basis. Indeed, PowerLinx had failed to ship *any* commercially viable SecureView cameras to dealers or customers during fiscal year 2000.

31.    In addition, in its discussion of the restatement, PowerLinx attributed its improper accounting to its new SecureView product, when, in fact, all of PowerLinx's fictitious revenues for the first and second quarters of 2000 derived from dealer floor plans for its underwater cameras. This distinction was material because PowerLinx had characterized the underwater camera as its "core product." By attributing its improper accounting to a new product, PowerLinx created the misleading impression that its core business was stable, when in fact actual sales of underwater cameras had declined throughout fiscal year 2000.

32.    PowerLinx also asserted in its Form 10-K that "[a]ggressive selling efforts [had] achieved approximately *$9 million in SecureView product orders from independent retailers and individual customers*." (Emphasis added.) This purported $9 million SecureView backlog was also discussed in a December 2000 press release, in which PowerLinx stated, "[t]he Company will roll into 2001 with a backlog of orders totaling over $9 million." These statements were misleading because the "orders" comprising the purported $9 million backlog were consignment

orders and not actual product sales. By representing its dealer floor plan orders as "product orders from independent retailers and individual customers," PowerLinx created the misleading impression that there was actual demand for SecureView cameras and that such demand would translate into future revenue as soon as PowerLinx could manufacture sufficient product to begin filling the orders. In fact, there was little, if any, demand for SecureView cameras at the time PowerLinx filed its Form 10-K in April 2001.

33.    Cox signed PowerLinx's materially misleading Form 10-K for fiscal year 2000 even though he knew, or was reckless in not knowing, that PowerLinx's rationale for the restatement was misleading and that the purported $9 million backlog was comprised of dealer floor plan orders instead of real orders to buy product.

34.    Bernardich participated in drafting and signed PowerLinx's inaccurate Form 10-K and was reckless in not ascertaining the accuracy of the representations contained in the report concerning the rationale for the restatement and the purported $9 million backlog of orders.

## III.    Other Improper Accounting and Reporting During Fiscal Year 2000

### A.    Improper Accounting for Convertible Debentures

35.    During the first quarter of 2000, PowerLinx issued convertible debentures, raising cash proceeds of over $2.5 million. The debentures entitled the holder to an eight percent return and, at the holder's option, were convertible at any time into restricted common stock at prices ranging from $.50 to $8.00 per share. At that time, those conversion prices represented a substantial discount (at least eighty percent, on average) to the prevailing price of PowerLinx's stock traded on the OTCBB.

11

36.    Under GAAP, when a company issues convertible debentures that can be converted to the issuer's securities at a deep discount to the current market price, the issuer must account for the discount as an expense.

37.    PowerLinx failed to account for the discount as an expense, creating a material error in the company's income statement.  In addition, PowerLinx failed to keep adequate records documenting the precise discount it had given to each debenture holder, as required by Section 13(b)(2)(A) of the Exchange Act.

**B.    Improper Recording of a Deferred Tax Asset**

38.    Under GAAP, a company may record a deferred tax asset based on its reasonable expectation that current net tax operating losses will, in future years, offset expected future profits, thereby reducing the company's future income tax liability.  GAAP requires that the deferred tax asset be reduced by a "valuation allowance" to account for any likelihood that the company will fail to be profitable as expected.

39.    PowerLinx improperly recorded on its fiscal year 2000 balance sheet a deferred tax asset of $1,439,322 with no valuation allowance.  This amount was material, representing approximately thirty-eight percent of PowerLinx's $3,841,944 in total assets.

40.    PowerLinx also recorded deferred tax assets of $180,613, $72,907, and $44,921, respectively, in its financial statements for the first three quarters of 2000.

41.    PowerLinx lacked a legitimate basis for recording the deferred tax assets.  The company had accumulated significant losses in 2000 and had no historical operating basis from which to conclude that it would be profitable in future years.  Underwater camera sales had declined significantly, and the company had devoted most of its resources to developing its SecureView product.

42.    The sole basis for PowerLinx's "expectation" of future profitability was a purported $9 million backlog of dealer orders for its new security video product, which management assumed would generate taxable income. However, that purported backlog was unsupported and, as management later determined, unlikely to be realized. The purported backlog consisted primarily of orders with consignment terms, not orders to purchase cameras, and thus did not reflect actual demand for PowerLinx's products.

43.    In late 2001, PowerLinx's new management determined that the orders comprising the purported $9 million backlog were unlikely to be realized. In April 2002, after hiring a new audit firm, PowerLinx restated its 2000 financial results, reducing the value of the deferred tax asset on its balance sheet from $1,439,322 to zero. In its restatement, PowerLinx explained that the action was necessary because "projections of future taxable income d[id] not rise to the 'more likely than not' criteria." However, even in this restatement, PowerLinx failed to disclose that its prior statement concerning the $9 million order backlog – the sole basis for the deferred tax asset – had been false and misleading.

**C.    Improper Accounting for an Investment**

44.    On July 12, 2000, PowerLinx exchanged 150,000 restricted common shares for a twenty percent voting interest in Golden Springs, LLC ("Golden Springs"), owner and operator of a spa and mineral spring located in Florida. PowerLinx materially overstated the value of this interest in Golden Springs in its third quarter and year-end financial statements for fiscal year 2000.

45.    This transaction was facilitated by PowerLinx's issuance of 150,000 shares to Golden Springs with the agreement that PowerLinx's former chief executive officer, Richard McBride, would promptly replace the shares with his personal holdings. Upon replacement of the

13

shares by McBride, the common shares were immediately cancelled by PowerLinx. This did not, however, affect PowerLinx's obligation to properly account for the investment on its books and records. GAAP provides that when a corporation implicitly benefits from transactions made on its behalf by a principal stockholder, the corporation should account for the transaction.

46.     Under GAAP, consideration received for the issuance of securities is accounted for based on the fair value of the consideration received or the fair value of the securities issued, whichever is more reliably measurable. Additionally, if the fair value of restricted stock serves as the basis for measuring the consideration received, such a valuation should be determined in good faith and also reflect a discount from the market price of unrestricted securities of the same class.

47.     PowerLinx determined that the fair value of the 150,000 restricted shares issued to Golden Springs was the more reliable basis for establishing the initial carrying value of this investment. PowerLinx recorded the initial carrying value of the restricted shares at approximately $1 million, which was the same amount that Golden Springs had recorded on its balance sheet for the third quarter of fiscal year 2000. While this value represented a discount of approximately forty-seven percent from PowerLinx's stock price of $12.88 on July 12, 2000 (the closing date of the transaction), the discount departed significantly from the higher discount rate of eighty percent that PowerLinx had applied to numerous contemporaneous sales of restricted stock to other third parties during this period.

48.     Finally, PowerLinx's valuation of its interest in Golden Springs was based on an inflated stock price of $12.88 per share that was the result of the company's material overstatement of revenue and receivables.

49.     In its 2001 Form 10-K, and after hiring a new audit firm, PowerLinx disclosed that the initial carrying value of its interest in Golden Springs had been reduced from approximately $1

14

million to $146,000. After adjusting this revised carrying value for PowerLinx's share of Golden

Springs's losses in fiscal year 2000, the carrying amount of the investment was restated to $8,618

as of December 31, 2000.

50.    In addition to improperly accounting for the investment, PowerLinx also omitted

material information regarding its Golden Springs investment in both a press release and a Form 8-

K filed with the SEC on July 24, 2000. PowerLinx stated that Golden Springs had assets of $4.06

million, but failed to disclose that Golden Springs was a development-stage company with

significant debts, a history of quarterly losses, a negative net worth, and highly uncertain prospects.

## IV.    Fraudulent Conduct During Fiscal Year 2004

51.    In September 2004, PowerLinx again engaged in securities fraud by issuing

materially misleading press releases and making materially misleading SEC filings concerning a

purported $23 million sales contract with a purported defense contractor known as Universal

General Corporation ("UGC").

### A.    Misleading September 2004 Press Release and Form 8-K

52.    On or about September 23, 2004, PowerLinx issued a press release announcing that

it had executed a contract to supply digital powerline equipment to UGC, which would then market

and distribute such equipment to various U.S. and foreign government agencies. The release's

headline stated, "PowerLinx Secures Digital PowerLine Surveillance System Purchase Contract;

PowerLinx Contract to Generate Minimum of $23M Sales Revenue Over Three Years." The

release provided that the total contract value would range from $23 million to $47 million over

three years based on the mix of products supplied. The release further stated that PowerLinx

would begin shipping units to UGC in the fourth quarter of 2004. PowerLinx's release stated that

UGC was "a private domestic, U.S. company involved in a variety of projects involving new

innovations and technologies," but provided no additional information about UGC.  On or about September 23, 2004, PowerLinx also filed a Form 8-K with the SEC containing the aforementioned press release and attaching the executed contract with UGC.  Bernardich had executed the contract on PowerLinx's behalf, and was responsible for drafting and issuing PowerLinx's press release and Form 8-K announcing the UGC contract.

53.      In reaction to PowerLinx's press release and Form 8-K, PowerLinx's stock price increased from $0.25 per share on September 22, 2004 to a high of $0.42 per share, before closing at $0.38 per share, an increase of fifty-two percent from the previous day's closing price. Approximately eight million PowerLinx shares traded on September 23, 2004, as compared to an average daily volume of approximately 400,000 shares during the three weeks immediately preceding the press release.

54.      In reality, UGC had no revenues, no assets, and no means whatsoever to meet any portion of its $23 million contractual obligation to PowerLinx.  Prior to entering into the contract PowerLinx had taken virtually no steps to ascertain whether UGC was a legitimate company that could fulfill any portion of a $23 million financial obligation.  In particular, PowerLinx failed to obtain from UGC any financial statements or other credible documentation to demonstrate creditworthiness, or any evidence of contracts, distribution arrangements, or other relationships with the government agencies to which UGC purportedly would be distributing PowerLinx's products.  Bernardich was responsible for PowerLinx's failure to conduct due diligence on UGC. Accordingly, Bernardich knew or was reckless in not knowing that PowerLinx's press release and Form 8-K announcing the UGC contract were materially misleading.

**B.      Misleading November 2004 Press Release and Form 10-Q**

55.      In the September 2004 UGC press release, PowerLinx stated that it "will begin shipping units in the 4th quarter" to UGC, and that the UGC contract required PowerLinx to deliver five units by October 5, 2004.  In early November 2004, certain PowerLinx shareholders sent e-mails to Bernardich inquiring whether PowerLinx had made the shipments to UGC that were required under the contract.  On November 11, 2005, in response to these inquiries and as PowerLinx was finalizing its Form 10-Q for the third quarter, Bernardich arranged for a purported shipment of products to UGC.  Although Bernardich knew that UGC possessed no facilities to receive the goods and had no foreseeable use for them at that time, he instructed a PowerLinx employee to arrange for a third party – the manufacturer with which PowerLinx had contracted to produce the goods in question – to serve as a "warehouse" to accept the goods on UGC's behalf.  Because the goods were already stored with this manufacturer on PowerLinx's behalf, Bernardich arranged for a purported "shipment" of the goods to UGC by arranging for the manufacturer to sign a PowerLinx invoice acknowledging receipt of the "shipment" by UGC.  In fact, the goods in question were never moved from their location at PowerLinx's manufacturer.

56.      On November 11, 2004, the same day in which Bernardich arranged for the purported shipment to UGC, PowerLinx issued a press release that contained the headline, "Company Ships Digital Powerline Surveillance Systems As Initial Fulfillment of UGC Contract." The release stated that PowerLinx "made a shipment of twenty digital powerline surveillance systems as initial fulfillment of our UGC contract."  Later that day, PowerLinx filed with the SEC its Form 10-Q, which stated, "To date, the Company has shipped 20 systems against the [UGC] contract."  Because PowerLinx failed to disclose material information about the circumstances of the purported shipment, the company's press release and Form 10-Q were materially misleading.

17

Bernardich arranged the purported shipment and drafted PowerLinx's press release and Form 10-Q, which he knew or was reckless in not knowing were materially misleading.

57.    On or about December 11, 2004, UGC was required to pay PowerLinx for the goods that PowerLinx purportedly shipped to UGC on November 11, 2004.  UGC did not make any payment at that time and, to date, has failed to make any payments to PowerLinx as called for under the contract.

58.    On February 10, 2005, a full two months after UGC had failed to pay PowerLinx any money due under the contract, PowerLinx finally disclosed to investors that it "has yet to receive payment for the units shipped to UGC in the fourth quarter of 2004 . . . and has sent UGC a demand for payment and will pursue its rights pursuant to the contract."

**FIRST CLAIM FOR RELIEF**
Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 thereunder
[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

59.    Paragraphs 1 through 58 are hereby realleged and incorporated by reference.

60.    Defendants PowerLinx, Bernardich, and Cox, by engaging in the conduct described above, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of securities:

        (i)     employed devices, schemes, or artifices to defraud,

        (ii)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

18

> (iii)    engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

61.    By reason of the foregoing, defendants PowerLinx, Bernardich, and Cox, directly or indirectly, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
Violations of Section 15(d) of the Exchange Act
and Rules 15d-1, 15d-11, 15d-13, and 12b-20 thereunder
[15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.15d-1,
240.15d-11, 240.15d-13, and 240.12b-20]

62.    Paragraphs 1 through 61 are hereby realleged and incorporated by reference.

63.    Defendant PowerLinx, by engaging in the conduct described above, failed to file with the SEC annual, current, and quarterly reports that were accurate and not misleading.

64.    By reason of the foregoing, defendant PowerLinx violated, and unless restrained and enjoined will continue to violate, Section 15(d) of the Exchange Act and Rules 15d-1, 15d-11, 15d-13, and 12b-20 thereunder [15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.15d-1, 240.15d-11, 240.15d-13, and 240.12b-20].

### THIRD CLAIM FOR RELIEF
Aiding and Abetting Violations of
Section 15(d) of the Exchange Act and
Rules 15d-1, 15d-11, 15d-13, and 12b-20 thereunder
[15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.15d-1,
240.15d-11, 240.15d-13, and 240.12b-20]

65.    Paragraphs 1 through 64 are hereby realleged and incorporated by reference.

66.    Defendants Bernardich and Cox knowingly provided substantial assistance to PowerLinx's violations of the periodic reporting provisions of the Exchange Act.

67.    By reason of the foregoing, Bernardich aided and abetted violations of Section 15(d) of the Exchange Act and Rules 15d-1, 15d-11, 15d-13, and 12b-20 thereunder [15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.15d-1, 240.15d-11, 240.15d-13, and 240.12b-20].

68.    By reason of the foregoing, Cox aided and abetted violations of Section 15(d) of the Exchange Act and Rules 15d-1, 15d-13, and 12b-20 thereunder [15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.15d-1, 240.15d-13, and 240.12b-20].

## FOURTH CLAIM FOR RELIEF
Violations of Section 13(b)(2)(A) of the Exchange Act
[15 U.S.C. § 78m(b)(2)(A)]

69.    Paragraphs 1 through 68 are hereby realleged and incorporated by reference.

70.    Defendant PowerLinx, by engaging in the conduct described above, failed to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of the company's assets.

71.    By reason of the foregoing, PowerLinx violated, and unless restrained and enjoined will continue to violate, Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## FIFTH CLAIM FOR RELIEF
Violations of Section 13(b)(2)(B) of the Exchange Act
[15 U.S.C. § 78m(b)(2)(B)]

72.    Paragraphs 1 through 71 are hereby realleged and incorporated by reference.

73.    Defendant PowerLinx, by engaging in the conduct described above, failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

74.    By reason of the foregoing, PowerLinx violated, and unless restrained and enjoined will continue to violate, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

20

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Securities and Exchange Commission respectfully requests that this Court enter a judgment:

(i)      permanently enjoining defendant PowerLinx, Inc., from violating Sections 10(b), 13(b)(2)(A), 13(b)(2)(B), and 15(d) of the Exchange Act and Rules 10b-5, 15d-1, 15d-11, 15d-13, and 12b-20 thereunder [15 U.S.C. §§ 78j(b), 78o(d), 78m(b)(2)(A), and 78m(b)(2)(B) and 17 C.F.R. §§ 240.10b-5, 240.15d-1, 240.15d-11, 240.15d-13, and 240.12b-20];

(ii)      permanently enjoining defendant Bernardich from violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5], and from aiding and abetting violations of Section 15(d) of the Exchange Act and Rules 15d-1, 15d-11, 15d-13, and 12b-20 thereunder [15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.15d-1, 240.15d-11, 240.15d-13, and 240.12b-20];

(iii)      permanently enjoining defendant Cox from violating Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5], and from aiding and abetting violations of Section 15(d) of the Exchange Act and Rules 15d-1, 15d-13, and 12b-20 thereunder [15 U.S.C. § 78o(d) and 17 C.F.R. §§ 240.15d-1, 240.15d-13, and 240.12b-20];

(iii)      ordering defendants Bernardich and Cox to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(iv)    ordering that Bernardich and Cox be prohibited, pursuant to Section 21(d)(2) of the

Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as officers or directors of any issuer that has a

class of securities registered pursuant to Section 12 of the Exchange Act, or that is required to file

reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

(v)    granting such other relief as this Court may deem just and appropriate.

Respectfully submitted,

Michael K. Lowman (D.C. Bar No. 460180)
Antonia Chion
Yuri B. Zelinsky
Michael A. Ungar
Scott F. Weisman
Attorneys for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC  20549
(202) 551-4477 (Lowman)
(202) 772-9227 (Fax)

Dated: June 27, 2006
Washington, D.C.